## STATE OF CONNECTICUT *v.* RICHARD POUNCEY
### (SC 15412)

Callahan, C. J., and Norcott, Katz, Palmer and Peters, Js.

Argued March 19—officially released July 22, 1997

*Lauren Weisfeld*, assistant public defender, for the appellant (defendant).

*Carolyn K. Longstreth*, assistant state's attorney, with whom were *Elizabeth Baran*, assistant state's attorney, and, on the brief, *Michael Dearington*, state's attorney, for the appellee (state).

*Opinion*

PALMER, J. In this certified appeal, the defendant, Richard Pouncey, asks us to invoke our inherent supervisory authority over the administration of justice to reverse his conviction of two counts of attempted assault in light of certain objectionable remarks made by the assistant state's attorney during her closing argument to the jury. The jury convicted the defendant of

two counts of attempted assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1).[1] The defendant appealed from the judgment of the trial court[2] to the Appellate Court, claiming, inter alia, that he was entitled to a new trial as a result of racially inflammatory comments made by the assistant state's attorney during her closing argument to the jury. The Appellate Court rejected the defendant's claim and affirmed his conviction. *State* v. *Pouncey*, 40 Conn. App. 624, 673 A.2d 547 (1996). We granted the defendant's petition for certification to appeal limited to the following issue: "In the circumstances of this case, should the Appellate Court have exercised its supervisory power to order a new trial because of prosecutorial misconduct in the prosecutor's closing argument?" *State* v. *Pouncey*, 237 Conn. 911, 675 A.2d 457 (1996). We affirm the judgment of the Appellate Court.

The facts that the jury reasonably could have found are set forth in the opinion of the Appellate Court. "On the evening of December 14, 1991, four women had dinner at a restaurant on York Street in New Haven. As they left the restaurant, they observed the defendant and a pregnant female engaged in a heated argument at the corner of York and Chapel Streets. As the pregnant woman walked away from the defendant, he walked quickly toward the women appearing to be extremely angry and emotionally upset. The women were appre-

---

[1] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[2] The trial court imposed a total effective sentence of twenty-four years imprisonment, suspended after twenty years, and five years probation.

hensive and moved closer together to give the defendant room to pass them on the sidewalk. When the defendant reached them, he asked, 'What the hell is wrong with you?' 'Are you looking for trouble?' or 'What the fuck are you looking at?' He then collided with one of the women, punched her in the jaw and knocked her down. A second woman told the defendant, 'Keep going, we don't want any trouble.' The defendant then lunged at her, grabbed her by the front of her coat collar and, in a savage and wild manner, began to slash, punch and stab at her with a box cutter. The victim sustained a cut behind her left ear that was two inches long and one-quarter inch deep.. Her coat was cut in four or five places.

"As the first woman got up from the sidewalk, she attempted to pull the second woman away from the defendant. The defendant then slashed her face with the box cutter, cutting her upper lip and slashing her lower lip open from its lower edge down to her chin, causing her to fall back down to the sidewalk.

"The defendant left when a parking lot attendant, who saw the victims bleeding, intervened. When the police arrived, they found the defendant hiding in an alley a short distance away. The police retrieved the box cutter, detained the defendant and returned him to the scene of the assault. After the victims identified the defendant as the assailant, the police arrested him and placed him in a police cruiser, at which time he stated that he had 'cut the fucking bull dikes because they were surrounding [him]. Who gives a fuck about them.'" *State* v. *Pouncey*, supra, 40 Conn. App. 626–27.

On appeal to the Appellate Court, the defendant claimed that the trial court improperly had denied his motion for a mistrial on the ground that certain comments made by the assistant state's attorney during her closing argument violated his due process right to a

fair trial. In the alternative, the defendant maintained that the Appellate Court should invoke its supervisory authority to grant him a new trial in light of the assistant state's attorney's improper remarks.[3]

The Appellate Court summarized the facts relevant to these claims as follows. "The prosecuting attorney opened her final argument as follows: '[The four women] got together for dinner on December 14, 1991, a nice relaxing dinner. They had plans to go out after dinner. They were minding their own business when they were confronted with what suburbanites would call the ultimate urban nightmare.'

"The defendant's counsel made no objection and the prosecutor's initial argument was completed. During his summation to the jury, the defendant's counsel characterized the challenged comment as racist.[4] On closing argument, the prosecutor, in replying to the defendant's closing arguments regarding self-defense, commented that '[t]hese women were in the wrong place at the wrong time in an urban neighborhood.' Again no objection was made by the defendant's counsel. After the luncheon recess the defendant moved for a mistrial.[5]

---

[3] The defendant also claimed that the trial court improperly had: (1) instructed the jury on self-defense and reasonable doubt; and (2) failed to declare a mistrial after the assistant state's attorney, during her cross-examination of a defense witness, made reference to the fact that the defendant was incarcerated in lieu of bond. These claims, which were rejected by the Appellate Court, are outside the scope of this certified appeal.

[4] In particular, defense counsel stated: "A couple of other comments with respect to the prosecutor's discussion with you. She is very adamant [that] this is not a dramatic reading, this is a criminal case. She talked with you about a suburbanite's urban nightmare. What does that mean? What does that have to do with this case? Does it have to do with four white women standing outside the pub and [the defendant] being a black? That hadn't entered the case until I heard that comment. I don't know what that means other than that. What's that doing in this case and why is she talking about that? Let's focus on the facts . . . ."

[5] Defense counsel argued in support of the motion for a mistrial as follows: "The basis of the [motion] is [that the assistant state's attorney] . . . referred to a suburbanite's ultimate urban nightmare both in [her initial]

The court denied the motion and also denied the defendant's request for a curative instruction. The court stated: 'I don't think that it is of such significance that it calls for any remarks by the court. If you felt it was significant you should have interrupted at the time. Something you gave some thought to over lunch apparently.' " *State* v. *Pouncey*, supra, 40 Conn. App. 634.

The Appellate Court rejected the defendant's due process claim, concluding that, "[i]n the context of this trial, the effect of the state's improper comments, if in fact they were improper, cannot be said to have affected the outcome of the trial, or to have so infected the trial with unfairness as to make the defendant's resulting conviction a denial of due process." Id., 636–37. Specifically, the Appellate Court reasoned that "[t]he prosecutor's comments were isolated, brief and confined to closing arguments. Defense counsel responded to the prosecutor's first comment. The prosecutor's comments were not the culmination of an improper theme developed throughout the trial, nor was a pattern of

closing argument and [in her rebuttal] closing argument." After the trial court noted that, in his summation to the jury, defense counsel had responded to the assistant state's attorney's use of the words "suburbanite's urban nightmare," defense counsel continued: "[I did so i]n response to [the assistant state's attorney] with respect to that [which] I would term as pandering to racism, nothing short of that on these jurors. I don't know what else that could mean. I don't know what the distinction between suburbs and urban areas [is]. Certainly in the context of four white women, I think only two were from the suburbs, and [the defendant] being black and being from New Haven, I don't know what other way that could conceivably have been taken by the jury and so I would be moving for a mistrial with respect to those comments. I think again such pandering with respect to racial fears and racial differences in this particular case, certainly in light of the history of this case and the discussions from the beginning of this case with respect to the fact that all the state's victims, all the state's witnesses were white, [the defendant] is black, we had a lot of discussion with respect to that during jury selection and [considering] that I can't read it any other way than to tell white people on the jury that they are—they ought to be afraid of black people like [the defendant] so let's do something about that. I move for a mistrial."

misconduct discernible. The defendant's argument of a cumulative prejudice, suffered as a result of the state's earlier reference to his incarceration, is without merit. Furthermore, the trial court clearly instructed the jury that the defendant was entitled to the presumption of innocence, and that the arguments of counsel during final summation were not evidence. The court also admonished the jury to 'keep in mind that this defendant . . . justly relies on you to carefully consider the claims made in his behalf by his counsel . . . and to consider all of the evidence and find him not guilty if the law and the facts [require] such a verdict.' Furthermore, the state presented a very strong case against the defendant." Id., 636. The Appellate Court did not expressly address the defendant's alternate claim that the court should reverse his conviction in the exercise of its supervisory authority over the administration of justice.[6]

Judge Spear dissented from the majority's decision not to grant the defendant a new trial under its supervisory powers, stating: "I do not quarrel with the majority's due process analysis. Indeed, [t]he fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. . . . *State* v. *Binet*, 192 Conn. 618, 628, 473 A.2d 1200 (1984); *State* v. *Millstein*, 8 Conn. App. 581, 590, 513 A.2d 1253, cert. denied, 201 Conn. 814, 518 A.2d 72 (1986). Our Supreme Court has stated, however, that [t]his court, nevertheless, has supervisory power to vacate a judgment of conviction and to order a new trial to deter prosecutorial misconduct, which, while not so egregious as to deprive the defendant of a fair trial, is *unduly offensive* to the maintenance of a sound judicial process. . . . *State* v. *Fullwood*, 194 Conn. 573,

---

[6] We note that the defendant did not file a motion seeking an articulation by the Appellate Court regarding this claim.

584, 484 A.2d 435 (1984)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Pouncey*, supra, 40 Conn. App. 639–40.

Judge Spear further stated that "[i]t is common knowledge that the population of the suburbs in Connecticut is overwhelmingly white, while most of the black population is concentrated in the cities. This state of affairs could hardly have escaped the prosecutor's notice. Given the starkly different racial composition of suburban and urban Connecticut, given the fact that the defendant is black while the two victims and the other prosecution witnesses are white, and given the lack of any valid reason for the challenged statements, the racial appeal is obvious.

"The state argues that the comment was not racist because it merely pointed out the well known fact that random acts of street violence occur more frequently in cities than elsewhere. . . . Such a fact, the state asserts, is related to the evidence and the issues in the case because it supported the state's contention that the defendant lashed out at innocent bystanders as a way of venting his anger.

"This explanation digs a deeper hole for the prosecutor. The state does not explain, and I do not understand, how general impressions about the frequency of violence in urban neighborhoods could have shed any light on the particulars of *this* case. The state asks this court to approve the proposition that the jury could have properly used its collective general knowledge about violence in the cities as evidence that the defendant committed acts of violence in this case. More importantly, the state does not even attempt to explain why the attack in this case was peculiarly a suburbanite['s] . . . ultimate urban nightmare. There is certainly no logical basis for the notion that the degree of fear and trauma associated with a razor attack turns on whether

the victim is a suburbanite and whether the location is urban. I can conceive of no explanation for the suburban-urban juxtaposition of the comments other than as an improper racial appeal to the jury. Racial conflict and divisiveness in our society is of such a long-standing and intractable nature that the prosecutor's duty scrupulously to avoid appeals to racial prejudice is particularly apropos in cases such as this one. I view one such appeal as one too many because it is unduly offensive to the maintenance of a sound judicial process. . . . *State* v. *Fullwood,* supra, 194 Conn. 584." (Emphasis in original; internal quotation marks omitted.) *State* v. *Pouncey,* supra, 40 Conn. App. 640–42 (*Spear, J.,* dissenting).

The sole issue presented by this appeal is whether the Appellate Court should have invoked its supervisory authority to grant the defendant a new trial in light of the allegedly inflammatory remarks made by the assistant state's attorney. Although we agree with the defendant that those statements were objectionable, we are not persuaded that reversal of his judgment of conviction is warranted.[7]

It is well established that " '[a] prosecutor is not an ordinary advocate. His [or her] duty is to see that justice is done and to refrain from improper methods calculated to produce prejudice and wrongful decisions by the jury.' *State* v. *Malley,* 167 Conn. 379, 389, 355 A.2d 292 (1974) (*Bogdanski, J.,* dissenting); *State* v. *Ubaldi,* 190 Conn. 559, 574, 462 A.2d 1001 (1983); *State* v. *Has-*

---

[7] By its very nature, an appellate court's decision whether to invoke its supervisory power in a particular case is a highly discretionary one. Although ordinarily the scope of our review of a discretionary judicial ruling is limited, we depart from that general principle in this case because this court bears the ultimate responsibility for the supervision of the administration of justice in the courts of this state. For this reason, we conclude that de novo review of the defendant's supervisory authority claim is appropriate under the circumstances of this case.

*kins*, 188 Conn. 432, 456–57, 450 A.2d 828 (1982); *State* v. *Ferrone*, 96 Conn. 160, 168–69, 113 A. 452 (1921)." *State* v. *Falcone*, 191 Conn. 12, 22, 463 A.2d 558 (1983). " '[B]y reason of his [or her] office, [a prosecutor] usually exercises great influence upon jurors. His [or her] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because [a prosecutor] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment.' " *State* v. *Couture*, 194 Conn. 530, 564–65, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985), quoting *State* v. *Ferrone*, supra, 168–69.

"While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." (Internal quotation marks omitted.) *State* v. *Falcone*, supra, 191 Conn. 22. We have cautioned repeatedly that a prosecutor should "avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from their duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 243–44, 690 A.2d 1370 (1997); *State* v. *Couture*, supra, 194 Conn. 562; *State* v. *Carr*, 172 Conn. 458, 470, 374 A.2d 1107 (1977); see also *State* v. *Williams*, 204 Conn. 523, 538, 529 A.2d 653 (1987). Thus, even when prosecutorial misconduct is not so egregious as to implicate the defendant's right to a fair trial, an appellate court may invoke its supervisory authority to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is

improper.[8] See, e.g., *State* v. *Ubaldi, supra,* 190 Conn. 575; see also *State* v. *Ruiz,* 202 Conn. 316, 330, 521 A.2d 1025 (1987). Such a sanction generally is appropriate, however, only when the "[prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." *State* v. *Ubaldi, supra,* 575.

The question before us is whether the remarks that the assistant state's attorney made during closing argument are so repugnant to the fair administration of justice that the Appellate Court should have granted the defendant a new trial to send a strong message that such conduct will not be tolerated. Appellate courts possess "an inherent supervisory authority over the administration of justice. *Pinsky* v. *Statewide Grievance Committee,* 216 Conn. 228, 232, 578 A.2d 1075 (1990); *State* v. *Holloway,* 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989); *State* v. *Ross,* 208 Conn. 156, 158–59, 543 A.2d 284 (1988); *State* v. *Madera,* 198 Conn. 92, 99, 503 A.2d 136 (1985); *State* v. *Ubaldi,* [supra, 190 Conn. 575]. The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . *McNabb* v. *United States,* 318 U.S. 332, 340, 63 S. Ct. 608, 87 L. Ed. 819 (1942). Rather, the standards

---

[8] "A great deal is at stake in a criminal trial. The interests involved go beyond the private interests at stake in the ordinary civil case. They involve significant public interests. . . . [T]he criminal jury trial has a role in protecting not only the liberty of the accused, but also the entire citizenry from overzealous or overreaching state authority. *Duncan* v. *Louisiana,* 391 U.S. 145, 156, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968)." *State* v. *Patterson,* 230 Conn. 385, 398, 645 A.2d 535 (1994), on appeal after remand, 236 Conn. 561, 674 A.2d 416 (1996). As we previously have noted, the Appellate Court unanimously rejected the defendant's claim that his due process rights were violated by the two inappropriate remarks made by the assistant state's attorney during closing argument. Because we did not certify that question; see footnote 3 of this opinion; it is not before us.

are flexible and are to be determined in the interests of justice. *State* v. *Ross*, supra, 159; *State* v. *Patterson*, 230 Conn. 385, 397–98, 645 A.2d 535 (1994)." (Internal quotation marks omitted.) *State* v. *Jones*, 234 Conn. 324, 346–47, 662 A.2d 1199 (1995).

"Of course, our supervisory authority is not a form of free-floating justice, untethered to legal principle." *United States* v. *Ming He*, 94 F.3d 782, 792 (2d Cir. 1996). Thus, "[e]ven a sensible and efficient use of the supervisory power . . . is invalid if it conflicts with constitutional or statutory provisions." (Internal quotation marks omitted.) *Bank of Nova Scotia* v. *United States*, 487 U.S. 250, 254, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988). "Reversal of a conviction under [such] supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct. *United States* v. *Hasting*, 461 U.S. 499, 505–507, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983); *State* v. *Ubaldi*, supra, [190 Conn.] 572." *State* v. *Ruiz*, supra, 202 Conn. 330.

With these principles in mind, we consider the context in which the objectionable remarks were made. As noted by Judge Spear, the defendant in this case is black and his two female victims are white. Furthermore, at the time of trial, at least one of the two victims and all of the jurors lived in suburban towns.[9] In light of this context, the defendant characterizes the assistant state's attorney's remarks as intentional pandering to the racial fears of the suburban jurors. The state disputes this claim, but acknowledges that the statements

[9] The record does not indicate where the second victim resided.

were susceptible of a racial interpretation.[10] Because the assistant state's attorney's remarks reasonably could have been construed as an appeal to racially based fears of urban crime, we conclude that the comments were outside the bounds of appropriate argument.

Having so concluded, we must now determine whether the sanction urged by the defendant, namely, reversal of his conviction, is warranted. First, our careful review of the entire record reveals that the assistant state's attorney made no other remarks during the course of the trial that even arguably could be described as racially insensitive or provocative. On the contrary, the objectionable remarks were brief, isolated, and not so prejudicial as to prompt an immediate objection by the defendant. Second, "[t]he trial court not only expressly found that the prosecutor's remarks were insufficiently prejudicial to warrant a mistrial, but concluded that they were not sufficiently prejudicial to require a curative instruction. Therefore, the trial court did not consider the remarks to rise to the level of 'prosecutorial misconduct.' " *State* v. *Pouncey*, supra, 40 Conn. App. 635. As we previously have stated, the trial court's ruling "is entitled to weight because of the vantage point from which it can observe and evaluate the circumstances of the trial. The trial court is in a better position to determine the propriety of the

---

[10] The state contends that the assistant state's attorney's use of the term "suburbanites" was not a reference either to the victims or to the jurors. Instead, the state maintains that the remarks invoked "common knowledge" regarding the fears that suburbanites have of urban high crime areas and, further, that the comments were intended solely to underscore the state's claim that the defendant's attack was random and unprovoked. Even if we assume, arguendo, that crime statistics support a claim that New Haven has a higher crime rate than its suburban areas, those statistics do not justify rhetoric, like that engaged in by the assistant state's attorney in this case, that is irrelevant to the question of the defendant's guilt and potentially could arouse the passions or fears of the jury.

remarks of counsel and whether or not they are harmful. *State* v. *Glenn*, 194 Conn. 483, 493, 481 A.2d 741 (1984)." (Internal quotation marks omitted.) *State* v. *Pouncey*, supra, 635. Consequently, we agree with the Appellate Court that any prejudice suffered by the defendant as a result of the comments was not so great as to have had a bearing on the jury's verdict.

Moreover, it is indisputable that a reversal of the defendant's conviction would force the victims in this case to relive, during a new trial, the emotional trauma that they suffered as a result of the defendant's vicious attack.[11] In addition, because the incident occurred more than six years ago, the potential for memory loss by the victims and other key witnesses is a legitimate concern. These considerations militate heavily against reversal of the defendant's conviction.

Furthermore, the defendant does not claim either that the assistant state's attorney in this case previously has used racially charged rhetoric in her arguments to other juries or that state prosecutors generally have engaged in a pattern or practice of making arguments to juries that may be considered exploitative of racial bias or prejudice. If such a pattern or practice of miscon-

---

[11] At the defendant's sentencing on December 11, 1992, the trial court noted the "obvious emotional scars [inflicted] on both of the victims" as a result of the incident. At trial, the victim whose scalp was slashed by the defendant testified that she still felt pain in that area, that she had been terrorized by the incident, and that she had scheduled a visit with a counselor "because of my continued fear as a result [of] the incident. . . . I'm finding it very difficult to perform my duties [in nursing school] without being afraid sometimes." The assistant state's attorney represented that this victim was too traumatized to attend the defendant's sentencing hearing. A friend of this victim who had witnessed the assault, however, did attend the hearing, and explained that the victim "no longer comes out . . . never joins us for any activities. . . . I watched [her] lose twenty pounds." The second victim, who required more than forty stitches to repair her mouth and chin, did speak at the defendant's sentencing and stated, "I still definitely have physical pain in my face, my lips and in my jaw. . . . [W]henever I look in the mirror I see my scar and feel the attack all over again."

duct were discernible among the state prosecutors, reversal of the defendant's conviction would serve the important purpose of demonstrating that such conduct cannot, and will not, be tolerated. In this case, however, we are loathe to invoke our supervisory power to reverse a conviction that has been obtained after a full and fair trial absent a colorable claim of such a pattern of prosecutorial misconduct.

Finally, we emphasize that nothing in the record before us indicates that the objectionable comments were the product of a deliberate appeal by the assistant state's attorney to racial biases or stereotypes. Thus, contrary to the defendant's claim, we do not ascribe a racial intent or motive to the assistant state's attorney in making these remarks. Although her comments were ill advised, they contain no direct reference to race, and any racial implication contained therein is not so direct or obvious as to lead us to conclude that such an improper connotation was intended. Cf. *State* v. *Couture*, supra, 194 Conn. 564; *State* v. *Ubaldi*, supra, 190 Conn. 567, 573–75. Furthermore, the presence of a black juror on the jury panel[12] supports the state's argument that the assistant state's attorney did not intend for her comments to be construed as an appeal to racial prejudice. Indeed, because a unanimous verdict was necessary for the state to obtain a conviction, it is highly unlikely that the assistant state's attorney intentionally would have risked alienating one or more jurors with a racially inflammatory argument.

As the state's representative, a prosecutor must take great care to avoid using language in argument that is susceptible to an improper racial connotation. Such rhetoric has no place in the courtrooms of this state. We previously have exercised our inherent supervisory

[12] It is undisputed that one of the six jurors who rendered the verdict in this case was black.

authority to safeguard against the improper consideration of race in criminal trials; see *State* v. *Holloway*, supra, 209 Conn. 645–46; and we will not hesitate to do so again if necessary. Under the specific circumstances of this case, however, and because there is no allegation of a pattern or practice of racially provocative conduct by any prosecutor in this state, we see no reason why the extreme remedy of a reversal is necessary either to sanction the state or to deter prosecutors from engaging in racially inappropriate argument in future cases.[13]

After careful consideration of all of the factors relevant to the resolution of the defendant's claim, we conclude that reversal of the defendant's conviction is not warranted. Accordingly, we agree with the Appellate Court's decision not to invoke its supervisory authority to grant the defendant a new trial.

The judgment of the Appellate Court is affirmed.

In this opinion CALLAHAN, C. J., and KATZ and PETERS, Js., concurred.

NORCOTT, J., dissenting. The prosecutor summarized the state's case for the jury with the following comments: "[T]hey were confronted with what suburbanites would call the ultimate urban nightmare. . . . [T]hese women were in the wrong place at the wrong

---

[13] The dissent concludes that the prosecutor's comments were "so prejudicial to the defendant" that their "[e]ffect, rather than [the prosecutor's] intent, should be sufficient for this court to intervene." Although prejudice to the defendant is one factor to be considered in determining whether a conviction should be set aside in the exercise of our supervisory authority, we must balance all of the relevant considerations in reaching such a determination. *State* v. *Ruiz*, supra, 202 Conn. 330; *State* v. *Ubaldi*, supra, 190 Conn. 572. Moreover, *both* the Appellate Court majority *and* Judge Spear expressly rejected the defendant's claim that the prejudicial effect of the prosecutor's comments violated the defendant's due process right to a fair trial. *State* v. *Pouncey*, 40 Conn. App. 636–37, 639. Because we have not certified the defendant's due process claim, that issue is not properly before us, and we will not convert the defendant's supervisory authority claim, which we did certify, into a constitutional claim, which we did not.

time in an urban neighborhood." The majority held that this court should not utilize its supervisory powers and reverse the judgment of conviction in this case. Notwithstanding the gravity of the underlying crime in this case and the dramatic remedy that is sought by the defendant, I believe that the prosecutor's comments in the context of this case were so prejudicial to the defendant that a new trial is required.[1] Accordingly, I respectfully dissent.

I recognize and agree with the majority that this court has and should exercise its supervisory powers to reverse a conviction in a criminal case only under the gravest of circumstances. *State* v. *Ubaldi*, 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). "Indeed, it is well established that serious prosecutorial misconduct, regardless of the prosecutor's intentions, may so pollute a criminal prosecution as to require a new trial, even without regard to the prejudice to the defendant." (Internal quotation marks omitted.) *State* v. *Couture*, 194 Conn. 530, 563, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). Where even a subtle pandering to the racial factor is implicated in a trial, the determination of what constitutes a "grave circumstance" is resolved.

The majority agrees that the prosecutor's comments in the present case were ill advised, "outside the bounds of appropriate argument," and "could have been construed as an appeal to racially based fears of urban crime," but were not so egregious as to warrant a new trial. The majority seeks to neutralize the comments by

---

[1] I fully agree with Judge Spear's dissenting opinion that, given that the defendant was black and the victims were white women from the suburbs, he could conceive of no explanation for the prosecutor's reference to the "'suburbanite's . . . ultimate urban nightmare' . . . other than as an improper racial appeal to the jury." *State* v. *Pouncey*, 40 Conn. App. 624, 641–42, 673 A.2d 547 (1996).

couching them as "brief, isolated, and not so prejudicial as to prompt an immediate objection by the defendant." The majority agrees with the Appellate Court that " '[t]he prosecutor's comments were not the culmination of an improper theme . . . nor . . . a pattern of misconduct . . . .' " I disagree. The prosecutor's summation cut to the very heart of its theme of this case. Delivered in the culmination of the prosecution's case to the jury, these comments placed this crime in a context that effectively resonated racial fears. The remarks revealed the prosecution's emphasis on the defendant's race and invited the jury to consider it as a relevant, and more importantly, an aggravating factor, in the assault of two white female victims. In addition to sidestepping the prosecution's portrayal of the crime, the majority ignores the powerful impact of the timing of the comments. Among the final words of persuasion the jury would hear before deliberation, the prosecution's appeal to the suburban jury's racial fears was likely, even if not intended, to inflame and infect their consideration of the merits of the case, diverting the jury's attention "from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding." *Stone* v. *Powell*, 428 U.S. 465, 490, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976).

I also disagree with the majority's focus on whether the improper racial connotation was intentional. In his dissent to the Appellate Court majority opinion, Judge Spear cogently explained why the challenged prosecutorial comments warranted a new trial. Inherent in that explanation, for me, is the belief that the intent of the prosecutor matters little when the effect of the comment improperly panders to racial fears, a consideration unarguably beyond the proper deliberation of the jury. Nearly one half century ago, the United States Supreme Court counselled prosecutors "to refrain from improper methods calculated to produce a wrongful conviction

. . . ." *Berger* v. *United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935), overruled on other grounds, *Stirone* v. *United States*, 361 U.S. 212, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960). "The Court made clear, however, that the adversary system permits the prosecutor to prosecute with earnestness and vigor. . . . In other words, while he may strike hard blows, he is not at liberty to strike foul ones." (Citation omitted; internal quotation marks omitted.) *United States* v. *Young*, 470 U.S. 1, 7, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985). Counsel should always "avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from [its] duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 243–44, 690 A.2d 1370 (1997). The line separating acceptable from improper advocacy is not easily drawn; *United States* v. *Young*, supra, 7; but in the facts of the present case, even the majority concedes that these statements improperly pandered to racial fears and prejudices of the jury. Statements appealing to the consideration of race, such as the ones made in this case, are "the direct antithesis of every principle of American justice and fair play. They alone are enough to cast grave doubts upon the validity of the entire proceedings." *Malinski* v. *New York*, 324 U.S. 401, 434, 65 S. Ct. 781, 89 L. Ed. 1029 (1945) (Murphy, J., dissenting). The remarks, regardless of the prosecutor's intent, were inflammatory and posed a threat of improper influence of the jury. Effect, rather than intent, should be sufficient for this court to intervene.

I regard Judge Spear's analysis as so persuasive and well reasoned that to repeat the substance of his dissenting opinion, rather than emphasize my agreement with it, would risk detracting from the power of its original composition and, therefore, I will abstain from

such an attempt and simply assert that I incorporate its reasoning by reference.

What remains for this dissent, then, is this. To safeguard against the improper consideration of race in a criminal trial through the use of our supervisory powers is not a new concept for this court. *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). The prosecutor's remarks in the present case were tantamount to pandering to racial fears. As Judge Spear aptly noted: "Remarks such as the ones at issue here only add to a perception of unfairness, and such a perception, whether accurate or not, is clearly not in keeping with the well known maxim that justice must not only be done, but must appear to be done." *State* v. *Pouncey*, supra, 40 Conn. App. 642. Such conduct undermines the confidence and integrity of our court system and requires our intervention. "Those clothed with authority in court rooms of this nation have the duty to conduct and supervise proceedings so that an accused person may be adjudged solely according to the dictates of justice and reason. . . . [J]udges and officers of the court should take the initiative to create an atmosphere free from undue passion and emotionalism. This necessarily requires the exclusion of attacks or appeals made by counsel tending to reflect upon the race, creed or color of the defendant." *Malinski* v. *New York*, supra, 324 U.S. 434 (Murphy, J., dissenting). Our court has the duty to ensure that criminal proceedings are "conducted in surroundings free from poisonous and dangerous irrelevancies that might inflame the jury to the detriment of the defendants." Id. Remarks such as those made by the prosecution in the present case are not be tolerated in any way, shape, or form in the Connecticut courts. Once this court recognized the prosecutor's comments as exploitative of racial fears, it has the responsibility, indeed the duty, to reverse a conviction

tainted by such an irrelevant and prejudicial consideration. It seems incongruous to me that the majority here, in essence, concedes the racial connotation of the comments, yet pays mere lip service to the egregiousness of the remarks by ultimately embracing the discretionary determination of the trial court that the challenged comments did not rise to the level of reversible prosecutorial misconduct. I cannot ascribe nefarious motive to the prosecutor in this case, nor do I need to, in order to conclude from the record and the words themselves, that the conduct was so patently offensive as to bring it within the penumbra of our prior rulings that, pursuant to our supervisory powers, the sanction of a reversal of a criminal trial is to be afforded only when the prosecutorial conduct is "so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." *State* v. *Ubaldi*, supra, 190 Conn. 575.

In accordance with these principles, this case warrants the unsettling, unpopular, yet just decision to reverse the defendant's judgment of conviction. I believe that failure to do so lends legitimacy to the emphasis on race and exploitation of racial fears in arguments to the jury. Resolution of these legal issues that dwell within the disturbing concentric circles of race and crime is so difficult that those charged with the responsibility of prosecuting criminal cases on behalf of all the people of this state would be well advised to avoid the area as if it were the proverbial mine field.

It is for these reasons that I respectfully dissent.