STATE OF CONNECTICUT *v.* TYRONE MITCHELL
(AC 18962)

Lavery, C. J., and Spear and Mihalakos, Js.

Argued December 4, 2000—officially released October 16, 2001

*Francis L. O'Reilly*, special public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Michael A. Gailor*, assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, C. J. The defendant, Tyrone Mitchell, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3),[1] attempt to commit

---

[1] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ."

robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2)[2] and 53a-134 (a) (3), attempt to commit robbery involving an occupied motor vehicle in violation of General Statutes §§ 53a-49 (a) (2) and 53a-136a,[3] and larceny in the second degree in violation of General Statutes (Rev. to 1995) § 53a-123 (a) (3).[4] The defendant claims that the prosecutor committed misconduct during his arguments to the jury by (1) appealing to racial prejudice in his opening argument, (2) expressing his opinion of the defendant's guilt and vouching for the credibility of a key state's witness, and (3) commenting on the appropriate punishment for the defendant. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On April 13, 1996, during the afternoon hours, Antonio Innaimo and his friend, Stephen Corneau, went to the Copaco Shopping Plaza in Bloomfield. Corneau intended to purchase concert tickets at the Strawberries music store, one of the retail stores at the plaza. When they arrived at Strawberries, the men learned that the store accepted only cash and not credit cards for the purchase of concert tickets. They left the store and proceeded toward the area where Corneau had parked his Ford Bronco. As they approached the Bronco, they heard a person or persons chasing them. Upon turning

---

[2] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 53a-136a provides in relevant part: "Any person who commits robbery by taking a motor vehicle from the person of another knowing that such motor vehicle is occupied by such other person shall be imprisoned . . . ."

[4] General Statutes (Rev. to 1995) § 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and . . . (3) the property, regardless of its nature or value, is taken from the person of another . . . ."

around, they saw two males who told them to "give up" the Bronco or they would kill them. Corneau and Innaimo then ran toward the Bronco. Corneau managed to get inside the truck and lock the driver's side door. Innaimo tried to get into the Bronco through the passenger door, but that door was locked.

The defendant pulled out a knife that was approximately four to five inches long and began tapping the blade on the driver's side window while trying to open the driver's side door. He repeatedly told Corneau to "give it up," but Corneau refused to do so. The defendant and the other person with him, Tyrone Broaden, turned their attention toward Innaimo when Corneau made a motion as if he were going to unlock the passenger side door. Innaimo started to walk away as the defendant and Broaden came toward him. When the defendant was within six or seven feet of Innaimo, he told Innaimo to "tell [your] boy [meaning Corneau] to give up the [Bronco] or else he was going to [cut Innaimo]." The defendant made that threat while standing directly in front of Innaimo and holding the knife approximately one foot from Innaimo's face. Corneau started driving the truck in circles and beeping the horn to attract attention. At that point, the defendant instructed Innaimo to "give up [his] wallet," and Innaimo complied. After instructing Innaimo not to follow them, Broaden and the defendant walked away. Corneau and Innaimo went to the Bloomfield police department and reported the crime.

Broaden and the defendant stopped at the defendant's apartment, where the defendant changed clothes. Later, they returned to the shopping plaza. After receiving information that two individuals fitting the description of the attackers had been seen at the plaza, Bloomfield police officers went to the plaza, where they saw and detained the defendant and Broaden. When Innaimo and Corneau returned to the plaza, they both

identified Broaden as the smaller of the two black males who had attacked them. Neither could positively identify the defendant as the person who wielded the knife because the defendant had changed clothes. Innaimo said that the defendant was similar to the knife wielding attacker in his height, weight, build, eyes, shape of his head and complexion.

Broaden later confessed to participating in the crimes and identified the defendant as the other perpetrator. During a search, pursuant to a warrant, of the defendant's residence, the police discovered a wallet that matched the description of Innaimo's wallet and contained Innaimo's credit cards, personal identification papers and driver's license. The defendant subsequently was arrested and convicted, and this appeal followed.

The defendant concedes that he failed to preserve his misconduct claims at trial and seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[5] Alternatively, the defendant asks us to reverse the judgment of conviction pursuant to our supervisory power to deter prosecutorial misconduct that did not deprive the accused of a fair trial, but that "is unduly offensive to the maintenance of a sound judicial process." (Internal quotation marks omitted.) *State* v. *Fullwood*, 194 Conn. 573, 584, 484 A.2d 435 (1984). Although the first two prongs of *Golding* are satisfied, we conclude that the

---

[5] In *Golding*, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

defendant's prosecutorial misconduct claims are without merit. We also conclude that this case does not present an appropriate instance for us to invoke our supervisory authority.

I

The defendant first claims that the prosecutor made gratuitous racial comments during his opening argument to the jury. Specifically, the defendant asserts that the prosecutor's sixteen references to either "black males," "larger black male" or "smaller black male" violated his right to a fair trial.[6] He claims that the prosecutor's questioning of Broaden to elicit the fact that the victims were "white males" further demonstrates his gratuitous injection of race into the case.[7]

"Prosecutorial misconduct may . . . occur in the course of closing argument. . . . Such argument may be, in light of all of the facts and circumstances, so egregious that no curative instruction could reasonably be expected to remove [its] prejudicial impact. . . . We do not focus alone, however, on the conduct of

---

[6] The defendant claims that the prosecutor violated his right to a fair trial as guaranteed by the fourteenth amendment to the United States constitution, and article first, § 8, and § 19, as amended by article four of the amendments, of the constitution of Connecticut. The fourteenth amendment to the United States constitution provides in relevant part that "[n]o State shall . . . deprive any person of life, liberty or property, without due process of law . . . ." The defendant offers no separate analysis of his state constitutional claims, and we, therefore, limit our review to the federal constitutional claim. See *State* v. *Reid*, 254 Conn. 540, 553 n.6, 757 A.2d 482 (2000).

[7] The defendant relies on the following questions by the prosecutor:
"[Assistant State's Attorney:] Okay.
"[The Witness:] They walked by.
"Q. What did the guys look like?
"A. I don't know. They had jeans and shirt.
"Q. Were they white or were they black?
"A. Two white guys."
The defendant claims that because the prosecutor elicited that testimony after both victims had testified, the jury already knew that the victims were white and, therefore, the question as to race was unnecessary.

the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. . . . [T]o determine whether claims of prosecutorial misconduct amounted to a denial of due process, we must decide whether the challenged remarks were improper, and, if so, whether they caused substantial prejudice to the defendant. . . . To make this determination, we must focus on several factors: (1) the extent to which the misconduct was invited by defense conduct or argument; (2) the severity of the conduct; (3) the frequency of the conduct; (4) the centrality of the misconduct to the critical issues of the case; (5) the strength of the curative instructions adopted; and (6) the strength of the state's case. . . . When a verdict is challenged on the basis of the prosecutor's allegedly prejudicial remarks, the defendant bears the burden of proving the remarks prejudicial in light of the whole trial." (Citations omitted; internal quotation marks omitted.) *State v. Payne*, 63 Conn. App. 583, 590, 777 A.2d 731, cert. granted on other grounds, 257 Conn. 904, 777 A.2d 195 (2001).

We examine the prosecutor's remarks in light of the factors set out in *Payne*. Although the comments about the defendant's race were not invited in any way by defense counsel, the remarks were limited to the prosecutor's opening statement and were descriptive, not pejorative. The prosecutor in no way suggested, implied or hinted that the race of the attackers had any bearing on the case other than as a matter of identification. The prosecutor structured his argument in the form of a "mystery," with the first part of the mystery being what happened as described by the victims. It was during that section of the argument that the references to black males were made. When the prosecutor moved to the second part of the "mystery," the identity of the attack-

ers, he did not again mention their race. He referred to them by name during the rest of his opening argument and in his rebuttal argument.

The alleged misconduct was not central to any critical issue in the case. This case turned on the identification by the two victims and the testimony of the defendant's accomplice, Broaden. There was no question that the victims were white and no dispute that the two assailants were black. The issue was whether the defendant was the other perpetrator, and the prosecutor's remarks did not divert the jury from its duty to decide the case solely on the evidence.[8]

Last, under *Payne*, we review the strength of the state's case. Here, the testimony of the victims was borne out by the testimony of an admitted accomplice to the crimes and by the evidence that was discovered in the defendant's home pursuant to the search warrant.

This court has had only one other occasion to address a claim that several references to the defendant's race constituted an appeal to racial prejudice. In *State* v. *Garrett*, 42 Conn. App. 507, 681 A.2d 362, cert. denied, 239 Conn. 928, 929, 683 A.2d 398 (1996), we examined certain remarks about the defendant's race that the prosecutor made during closing argument.[9] We indicated our disapproval of the prosecutor's argument, but

[8] We do not discuss curative instructions, as none were sought and the defendant did not object to the closing argument.

[9] "Our review of the record discloses that, although the prosecutor uttered the words 'black' and 'blackness' a total of six times and the word 'race' twice, the comments were restricted to a very brief segment of the state's entire closing argument. Thus, the improper remarks were relatively infrequent and did not pervade the entire trial. For these reasons, and because the comments were not intended to disparage the defendant, they were not representative of a blatant and egregious pattern of misconduct that either deprive[d] the defendant of a fair trial . . . or otherwise implicate[d] the fairness and integrity of and public confidence in the judicial proceedings." (Citation omitted; internal quotation marks omitted.) *State* v. *Garrett*, supra, 42 Conn. App. 517.

concluded that the remarks were not so egregious as to have violated the defendant's right to a fair trial.

We again emphasize that we do not condone the gratuitous use of race, as the prosecutor did in this case, in closing arguments, but we conclude that under all of the circumstances here, the argument did not deprive the defendant of his right to a fair trial. We now address whether it would be appropriate for us to exercise our supervisory powers to reverse the judgment of conviction.

We are guided by *State* v. *Pouncey*, 241 Conn. 802, 699 A.2d 901 (1997), in which the sole issue was whether this court should have "invoked its supervisory authority to grant the defendant a new trial in light of the allegedly inflammatory remarks made by the assistant state's attorney." Id., 810. In *Pouncey*, the defendant claimed that the prosecutor had made an improper racial appeal during closing argument.[10]

Although our Supreme Court stated that the remarks in *Pouncey* were improper, the court affirmed our decision not to invoke our supervisory authority. "[E]ven when prosecutorial misconduct is not so egregious as to implicate the defendant's right to a fair trial, an appellate court may invoke its supervisory authority to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . Such a sanction generally is appropriate, however, only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively

[10] The defendant in *Pouncey*, a black male, was charged with assaulting two white women. In closing arguments, the prosecutor stated that the women "were confronted with what suburbanites would call the ultimate urban nightmare." (Internal quotation marks omitted.) *State* v. *Pouncey*, supra, 241 Conn. 806. She later argued that the women "were in the wrong place at the wrong time in an urban neighborhood." (Internal quotation marks omitted.) Id.

prevent such assaults on the integrity of the tribunal. . . . Of course, our supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . Thus [e]ven a sensible and efficient use of the supervisory power . . . is invalid if it conflicts with constitutional or statutory provisions. . . . Reversal of a conviction under [such] supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." (Citations omitted; internal quotation marks omitted.) Id., 811–13.

Contrary to the defendant's claim, we conclude that the questioning of Broaden did not demonstrate a racial intent or motive. The prosecutor's one question of Broaden about the race of the victims was merely descriptive and part of establishing that the two witnesses were indeed the two victims. We also note that the defendant can point to no prejudice that resulted from the prosecutor's closing arguments. In light of the strong case presented by the state, it is highly unlikely that the alleged racial appeal had any bearing on the verdict.

Moreover, there is no evidence that appeals to racial prejudice have been a pattern or practice among the state's prosecutors so that a supervisory reversal is necessary to put them on notice that such conduct cannot be tolerated. See id., 815–16. Pursuant to the factors stated in *Pouncey*, we are persuaded that we should not exercise our supervisory power to reverse the judgment of conviction.

## II

The defendant next claims that the prosecutor improperly expressed his opinion of the defendant's guilt and Broaden's credibility during his rebuttal argument with the following comments: "And why would he [Broaden] say the defendant did it? He's friendly with his son, friendly with him, no animosity between them. There would be no reason for him to pin this on [the defendant], absolutely not at all. He told the police that [the defendant] was the person who held the knife because, in fact, [the defendant] was the person who held the knife. He told the truth."

"The prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses. . . . Nor may he express his opinion, directly or indirectly, as to the guilt of the defendant." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 541, 529 A.2d 653 (1987).

"In determining whether the defendant was denied a fair trial [by prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Brown*, 256 Conn. 291, 297–98, 772 A.2d 1107 (2001). In closing argument, the defense attorney made much of Broaden's testimony being "bought"[11] by the state in return for a favorable disposition of certain charges against him. The prosecutor should not have stated that the defendant, in fact, "held the knife" or that Broaden "told the truth," but the main thrust of the argument rebutted the defendant's claim. The prosecutor emphasized the evidence and the inferences that properly could be drawn from the evidence to establish Broaden's credibility.

The improper remarks were brief and isolated, and were not part of an egregious pattern of misconduct.

[11] See footnote 12.

The alleged misconduct by way of those two brief remarks could not have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 204 Conn. 539. We conclude that the remarks do not rise to the level of a constitutional violation.

### III

The defendant's final claim is that the prosecutor's comment on the appropriate punishment for the defendant deprived the defendant of a fair trial. That claim also is without merit.

The prosecutor during rebuttal argued: "Should [Broaden] have been charged with the same charge as the defendant? Should he have received the same punishment; he was only sixteen years old. The defendant was thirty-two years old. All of those factors play into consideration when determining what the appropriate sentence was for Mr. Broaden." The defendant claims that the prosecutor by that argument indirectly asserted that the defendant was guilty and what punishment he should receive.

In closing argument, the defense counsel argued extensively about the plea bargained sentence for Broaden and that the jury should consider it in determining his credibility.[12] The prosecutor's remarks

---

[12] The defendant's attorney made the following closing argument: "Mr. Broaden, his testimony was bought by the state with very, very generous deals in this case. You heard him say on the robbery one he knows he could have gotten twenty years plus the attempt to commit robbery by carjacking he could have gotten twenty years. On the larceny in the second degree, he knew he could have gotten ten years. That's a total of fifty years he could have received. He received none. You're going to hear the judge say some words, motive, bias and interest. Mr. Broaden has the motive at first to lie to get out from under these charges. He has the interest to lie to continue to protect himself and keep himself in the good graces of the state and based on the treatment the state has offered him, he certainly—who is his buddy—he certainly has an interest in bias in favoring the state and that is what he did on the [witness] stand."

rebutted the defense attorney's claims about the credibility of Broaden. The fact that the sentence was discussed was a direct rebuttal to the maximum terms that were mentioned by defense counsel. Moreover, the court properly charged the jury that it was not to be concerned with any sentence that might be imposed in the event it found the defendant guilty. We conclude that there was no constitutional violation that denied the defendant a fair trial.

The judgment is affirmed.

In this opinion MIHALAKOS, J., concurred.

SPEAR, J., dissenting. I concur in parts II and III of the majority opinion, and the conclusion in part I that the prosecutor's references to the race of the perpetrators did not violate the defendant's right to a fair trial. I respectfully disagree, however, with the majority's conclusion that we should not exercise our supervisory power to vacate the judgment of conviction.

In *State* v. *Garrett*, 42 Conn. App. 507, 681 A.2d 362, cert. denied, 239 Conn. 928, 929, 683 A.2d 398 (1996), we addressed an unpreserved claim of prosecutorial misconduct that was based on the prosecutor's use of the words "black" or "blackness" six times during closing argument in reference to a black defendant. We concluded that *Golding* review was not warranted because the comments were restricted to a very brief segment of the closing argument. Even so, we cautioned that "[a]lthough we conclude that the racial comments were not so egregious as to deprive the defendant of a fair trial, this case presents a *serious* question as to whether we should invoke our supervisory power to vacate the judgment of conviction and order a new trial to deter similar conduct. . . . Our decision not to do so in this instance should not be misconstrued as a tacit approval of the prosecutor's conduct. We do not

condone such behavior." (Citation omitted; emphasis added.) Id., 517 n.9.

Our Supreme Court has remarked that "[w]e are mindful of the sage admonition that appellate rebuke without reversal ignores the reality of the adversary system of justice. The deprecatory words we use in our opinions . . . are purely ceremonial. [Prosecutors], employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice [of verbal criticism without judicial action] . . . breeds a deplorably cynical attitude towards the judiciary." (Internal quotation marks omitted.) *State* v. *Ubaldi*, 190 Conn. 559, 571, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983), quoting *United States* v. *Antonelli Fireworks Co.*, 155 F.2d 631, 661 (2d Cir.) (Frank, J., dissenting), cert. denied, 329 U.S. 742, 67 S. Ct. 49, 91 L. Ed. 640 (1946). Here, the prosecutor made sixteen gratuitous references to race less than two years after our caution in *Garrett*.[1] This is a classic example of the ineffectiveness of a "verbal spanking" without a reversal.

[1] Following are the relevant excerpts from the prosecutor's opening argument: "[T]hey were chased by two gentlemen, *two black males.* And they gave a description of those *black males. Black male* one about five feet, eleven inches, 200 pounds . . . . The *larger black male* . . . came up to the window and tapped a knife on the window. . . . When the *larger black male* realized . . . that [one of the victims, Stephen] Corneau wasn't going to give up the car, he walked around to the other side . . . . Fortunately, the *larger black male* didn't do anything at that point in time. Remember . . . there is *another black male*, a *smaller black male* . . . . When the *larger black male* goes to the car, he's sort of standing behind him a little bit. When the *larger black male* goes to the other side, he's still standing behind him a little bit . . . . At that point in time, the *larger black male* indicates to [the other victim, Antonio] Innaimo that he wants his wallet. . . . During that entire time, the *larger black male* is standing within three feet of Mr. Innaimo with the knife at the side of his face. . . . Mr. Innaimo gives up his wallet . . . to the *larger black male* . . . . [T]he *larger black male* threatened the use of force in order to get the person to give up the truck. . . . You have two suspects. You have *one larger black male*, five feet, eleven inches, 205, and you have a *smaller black male*, five feet, nine inches, approximately 155." (Emphasis added.)

Turning to the factors in *State* v. *Pouncey*, 241 Conn. 802, 699 A.2d 901 (1997), the extent of prejudice to the defendant and the availability of other sanctions for the prosecutor's misconduct weigh in favor of the defendant. With respect to prejudice, some courts have held that appeals to racial prejudice by prosecutors should automatically result in a reversal. See *Miller* v. *North Carolina*, 583 F.2d 701, 708 (4th Cir. 1978); *Weddington* v. *State*, 545 A.2d 607, 614–15 (Del. 1988). It is impossible to ascertain the effect of the improper racial appeal, and reversal is required because such conduct taints the entire trial proceeding. See "Race and the Criminal Process," 101 Harv. L. Rev. 1472, 1594–95 (1988). With respect to other sanctions that are available, our Supreme Court has stated: "According to some authorities, the evil of overzealous prosecutors is more appropriately combatted through contempt sanctions, disciplinary boards or other means. . . . This court, however, has long been of the view that it is ultimately responsible for the enforcement of court rules and prosecutorial misconduct cases." (Citation omitted.) *State* v. *Ubaldi*, supra, 190 Conn. 571. In short, it is the court's job to rein in such prosecutors.

There is no question that at a new trial, the victims would have to relive the incident with the attendant emotional trauma. That factor weighs against vacating the judgment of conviction. The " 'practical problems of memory loss and unavailability of witnesses after much time has elapsed' "; *State* v. *Pouncey*, supra, 241 Conn. 813; on this record, would not appear to be a significant problem. There is nothing in the record to indicate that the victims and the state's witness, Tyrone Broaden, would not be available for a new trial. Moreover, the witnesses may refresh their recollection from the transcript of the first trial, and the testimony of a witness who cannot be produced can be introduced. *State* v. *Ubaldi*, supra, 190 Conn. 572.

Most importantly, race is different. "Race occupies a special place in the modern law of constitutional criminal procedure . . . ." *Smith* v. *Farley*, 59 F.3d 659, 688 (7th Cir. 1995) (rejecting claim that prosecutor made improper appeal to racial prejudice), cert. denied sub nom. *Smith* v. *Parke*, 516 U.S. 1123, 116 S. Ct. 935, 133 L. Ed. 2d 861 (1996). Our Supreme Court has acknowledged that race is different in the context of alleged juror misconduct. *State* v. *Brown*, 235 Conn. 502, 528–29, 668 A.2d 1288 (1995) (en banc), requires that a trial court conduct a preliminary inquiry whenever juror misconduct is alleged. The scope and form of the inquiry is to be determined by the court in its discretion. "[A]n allegation of racial bias on the part of a juror differs so fundamentally from other types of juror misconduct that *Brown* is of limited guidance and does not go far enough. Because such allegations are a matter of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole . . . we deem it appropriate in all future cases in which a defendant alleges that a juror has made racial epithets, such as in the present case, that the trial court should conduct a more extensive inquiry than that prescribed in *Brown*." (Citation omitted; internal quotation marks omitted.) *State* v. *Santiago*, 245 Conn. 301, 340, 715 A.2d 1 (1998).

Because racial issues require careful scrutiny, the remarks here should be examined closely. I cannot conceive of any valid reason for those racial references. What could be the purpose of the numerous gratuitous references to the defendant's race other than to appeal to the possible racial prejudice of the jurors?[2] Imagine

[2] In his article, "The Demeanor Gap: Race, Lie Detection, and the Jury," Joseph W. Rand writes: "Thus, if a white juror has developed a schema that African-American men act a certain way, she will more easily process information that is consistent with that stereotype, and disregard information that is inconsistent. The bias may not be motivated by evil intent, but rather by an adaptive cognitive process." J. Rand, "The Demeanor Gap: Race, Lie Detection, and the Jury," 33 Conn. L. Rev. 1, 41 (2000).

a situation in which the two robbery victims were black and the two perpetrators were white, and the case was tried before an all black jury.[3] What would an observer conclude if the prosecutor made sixteen references to the fact that the perpetrators were white males? Put more simply, if the perpetrators in this case had been white, I cannot imagine that the prosecutor would refer to their race sixteen times in his closing argument to the jury.

Even though there does not appear to be any widespread problem of improper racial references during closing arguments by prosecutors in the state of Connecticut, I believe that we should back up the cautionary words that we used in *Garrett* with action in this case. I would vacate the judgment of conviction and order a new trial to send a message that this kind of conduct will not be tolerated in the future.

Accordingly, I respectfully dissent.

---

[3] There is no dispute that the jury in this case was all white.