[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a habeas corpus petition brought by the Petitioner, Lennard Toccaline (hereinafter also "Toccaline") by Second Amended Petition dated June 13, 2002 in three counts. The First Count claims Ineffective Assistance of Trial Counsel, the Second Count Ineffective Assistance of Appellate Counsel and the Third Count Factual Innocence. At the habeas trial which took place before this Court on July 9, 10, 11, 23 and 25, the Petitioner did not pursue Count Two.[1] His main claim is ineffective assistance of trial counsel who was privately retained Attorney Mark C. Hauslaib of Storrs, Connecticut, hereinafter also "Hauslaib".
The underlying facts of the criminal trial are essentially contained inState v. Toccaline, 258 Conn. 542, 545-6 (2001). The alleged victim was twelve years old at the time of the alleged crimes in 1996. The Petitioner, who was thirty-five years old at the time, was the boyfriend of the victim's Aunt, Bonnie C.[2] The victim, because of her age, was identified as MC. The Petitioner and Bonnie C. lived together in a house he rented at a lake in Ashford, Connecticut where MC sometimes visited. Three acts of sexual contact by the Petitioner allegedly occurred during the period from June 1996 though September 1996 when MC was twelve years old. In the first incident, the defendant allegedly kissed MC's breasts and vaginal area. In the second incident, which allegedly "occurred in August 1996, when the Petitioner and MC were fishing from a boat on the lake, the defendant placed MC's hand on his penis. He then put his hand over hers and manually stimulated himself until he ejaculated. During the third incident, which occurred in September 1996, the Petitioner invited MC to come to his bed. He then got on top of her, pinned her hands above her head, and penetrated her vagina with his penis. MC allegedly did not tell her mother or aunt about the events with the Petitioner because she was afraid of the Petitioner. In October 1996 MC and her family moved to another state."
State v. Toccaline, supra continued: "In February 1998, while cleaning CT Page 11961 MC's bedroom, her mother found a letter written to MC from a man named W (Wiseman), who was a friend of MC's family. W had begun to baby-sit for MC and her siblings in the summer of 1997. At that time, W was 32 years old and MC was 13. In the letter, W told MC that he wanted to hold her and take her pain away.[3]
MC's mother was concerned about the contents of the letter and confronted W about this relationship with MC. Her mother also confronted MC about her relationship with W. Although she denied any sexual contact with W, MC told her mother about the incidents that had occurred with the Petitioner during the summer of 1996. MC also had told W about the Petitioner's conduct prior to disclosing this information to her mother." In footnote 6 at page 546 of the decision by the Supreme Court it was stated: "At the trial, W admitted that he and MC had kissed on one
occasion, although both denied that they had engaged any sexual relations. W was investigated by the local police and family services unit, but no charges were brought against him." (Emphasis added). Continuing with the text: "The defendant (Petitioner) gave a statement to the police in which he responded to MC's allegations of sexual abuse. In the statement, the defendant claimed that he and MC often "horseplayed" together. The defendant admitted that he may have had sexual contact with MC during this horseplay, although, he claimed, MC never objected to such contact and that the contact did not constitute intercourse. The statement was entered into evidence and read aloud to the jury."
The jury returned a verdict of guilty on the charges of sexual assault in the first degree, one count of sexual assault in the fourth degree, and three counts of risk of injury to a child. The defendant elected to be tried by the court on a persistent dangerous felony offender charge which was based on a 1982 conviction for first degree sexual assault. Following his conviction on that count, the defendant was sentenced to a total effective term of forty years imprisonment, execution suspended after twenty-five years, and ten years probation. The State Supreme Court of the State of Connecticut affirmed the convictions. Additional facts will be set forth hereafter as necessary.
 STANDARD OF REVIEW
The "right to counsel is the right to the effective assistance of counsel". Strickland v. Washington, 466 U.S. 668, 686 (1984). InStrickland v. Washington, supra, the United States Supreme Court adopted a two-part standard for evaluating claims of ineffective assistance of counsel[4] during criminal proceedings: The defendant must show: (1) that counsel's representation fell below an objective standard of reasonableness, id. 687-88; and (2) that defense counsel's deficient CT Page 11962 performance prejudiced the defense, id. 694." As for the second prong of Strickland supra, the Petitioner is required "to demonstrate that there is a reasonable probability that the result of the proceedings would have been different had it not been for counsel's deficient performance. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Copas v. Commissioner of Correction,234 Conn. 139, 154-55 (1995).
In addition, the habeas court evaluates the credibility of the witnesses based upon whether their testimony at criminal trial as well as the habeas trial is inconsistent with testimony of others at the criminal trial and at the habeas trial and inconsistent with evidence produced at the habeas trial. In addition, the Court's evaluation of their credibility has been based upon their appearance and demeanor on the witness stand, the consistency and inconsistency of their testimony, their memory or lack thereof of certain events, whether they were candid and forthright or evasive and incomplete, their manner in responding to questions, their interest or lack of interest in the case, and in the case of expert witnesses, their qualifications and experience as well as all of the above-mentioned factors which applied to all witnesses.
 * * * *
The Court has reviewed its notes from the habeas trial, the transcripts of the testimony, the exhibits from said trial, the post-trial briefs of the parties, as well as the transcripts and exhibits from the criminal trial. Based upon the totality of the evidence this Court makes the following findings:
A. First count — Ineffective Assistance of Trial Counsel.
 1. Failure to Object to Questions to Elton Grunden.
Perhaps, the most glaring incident of ineffective assistance of trial counsel is his failure to object to questions posed by the State's Attorney, Debra Collins, (hereinafter also "Collins"), to one of the State's witnesses, Elton Grunden, (hereinafter also "Grunden") a licensed clinical social worker at a counseling and mental health center in the state, to which MC's family had moved, which was the State of Maryland. As the Supreme Court stated, State v. Toccaline, supra at page 548, Grunden stated: "He had met with MC in February, 1998, to discuss her allegations of sexual abuse by the defendant. Grunden testified that in that meeting, MC had described incidents of sexual contact with the defendant. He also stated his opinion that the victim had suffered sexual abuse perpetrated by the defendant. Finally, Grunden testified that it CT Page 11963 was his opinion that MC's testimony was truthful, based, in part, on the consistency of her accusations. The defendant did not object to thequestions of Collins and this testimony of Grunden's. Nevertheless, thetrial court did issue a constancy of accusation instruction to the juryregarding Grunden's testimony on direct examination. See footnotes 8 and 9 in State v. Toccaline, supra. See CTT, Pg. 79.
The Supreme Court held that it was not proper for the prosecutor to obtain from her expert witness, Grunden, the expert's opinion as to whether or not MC was telling the truth and whether the defendant was guilty. The State's Attorney questioned Grunden as follows: "Okay. Andfrom your interview of the victim, and based on your professional experience, have you an opinion as to whether or not the victim was a victim of sexual abuse by the defendant in this matter?" to which the witness replied: "Of that, I don't have much doubt. Yes, I do believe that . . . I don't have much doubt that what the victim said is true." (Emphasis added). The Supreme Court went on to say: "Because, as noted previously, the defendant did not object to Grunden's testimony at the trial court, to prevail on his claim before this Court he must, as he admits, do so under either State v. Golding, supra, 213 Conn. 233, or the plain error doctrine. The State concedes that Grunden's testimony wasimproper, but argues that the defendant's unpreserved claims cannot succeed under either Golding or the plain error of doctrine. We agree with the State." (Emphasis added). Not only did Hauslaib fail to object, as noted by the Supreme Court, but he admitted that he was not aware of the rule that states "An expert witness must limit his or her opinions of child abuse victims in general and may not testify as to the credibility of a particular victim." This was cited in page 543 of Tait's Handbook ofConnecticut Evidence, Third Ed., which citing State v. Spigarolo,210 Conn. 359, 380 (1989) Tait goes on to say: ". . . but the expert must testify in general terms only and cannot be asked his or her opinion based on the facts of the case" citing State v. Freeney, 228 Conn. 582,591-592 (1993). Attorney Hauslaib testified at the habeas trial that he was not aware of that rule. Grunden's testimony clearly supported the credibility of the testimony of MC, and the credibility of MC was crucial to the outcome of the trial. The Supreme Court also stated, pages 550, 551: "Although the trial court, upon proper objection by the defendant, would have been required to exclude this testimony, the presentation of Grunden's statement to the jury in the absence of such an objection did not implicate a constitutional right or result in a fundamentally unfair trial. The court goes on to cite other cases, State v. Grenier,257 Conn. 797 (2001), stating that ". . . Unlike the present case, the defendant had objected to the improper testimony by the expert, thus preserving the issue for appeal, and our review was not limited toGolding or the plain error doctrine." Id. 802-804. CT Page 11964
 2. What Makes This Error by Hauslaib Even More Egregious is His Failure to Press a Motion for Sequestration of the Witnesses.
Since the Petitioner's wife was a potential witness, she would have been excluded as well, and the Petitioner objected to her being excluded. The Court said that if the other witnesses are excluded, then she has to be excluded also. If Grunden had been excluded from the courtroom, then he could not have testified, as he later did, that her testimony from his interview in February of 1998 was consistent with her testimony at the trial. The following colloquy between the State's Attorney and Grunden occurred:
"Q: Now, however, in your report you do state that the victim confirms several incidents of molestation with the defendant
"A: Yes. And that's the basis of my opinion that I stated for you earlier. That, again, she was very explicit, very direct, very consistent in her report of those issues, and it was all very similar to whatevidence she gave in her testimony this morning." (Emphasis added).
"Q: So you were here present while she testified today?"
"A: Yes."
"Q: And you're stating that her testimony today was what in relation to what she said about [the defendant] to you back in February of '98?"
"A: It was so consistent to be extremely similar in both her presentation and in the facts she presented."
"Q: And that is the reason you based your opinion that it, in fact, had occurred?"
"A: Yes."
In another answer, Grunden stated: "Yes, she was very clear, as she wastoday, about many of the details that she reported this morning." (Emphasis added).
Clearly, if Grunden had been excluded, he could not have testified as to what MC said at the trial that same morning. His testimony would be then much less supportive of MC's testimony. Although there may have been other constancy of accusation testimony from relatives and a "friend", this testimony by Grunden which would have been excluded if sequestration CT Page 11965 had been ordered was the only allegedly neutral source of constancy of accusation testimony. The trial judge, in his charge to the jury, cited the testimony of her counselor (Grunden), and if Grunden's testimony as to the similarity of her in court testimony to the statements she gave to him had been impossible to give, the constancy of accusation claim would have been weakened.
In the habeas trial, the Petitioner presented the testimony of Attorney Leon Kaatz, whom the Court qualified, without objection from the Respondent, as an expert witness on the conduct, abilities, etc. of criminal defense attorneys. He agreed that Hauslaib should have insisted upon the sequestration, and for the above reasons, the Court agrees.
3. Failure to Object to State's Attorney's Closing Remarks.
In the criminal trial Attorney Collins in her closing remarks stated: ". . . Counselor Grunden also said that he felt that there was definitely something that had happened with the defendant and did not feel that something had happened other than kissing with W. . . ." Appellate counsel also pointed out that Attorney Collins had brought this up in her rebuttal argument as well and claimed that she had exploited Grunden's testimony both in her closing statement and in her rebuttal. In rebuttal she stated: "Mr. Grunden said there was no doubt it occurred . . . Remember, he knew he was under oath. And he said in his opinion it had occurred between MC and the defendant." The Supreme Courts in footnote 11, page 551, stated: "If the defendant is alleging a form of prosecutorial misconduct resulting in the deprivation of his constitutional right to a fair trial, we first note that the defendant never objected to these remarks in the State's closing argument." It went on to say that the defendant could not prevail under either Golding or the plain error doctrine. However, if Attorney Hauslaib had objected[5]
either during the closing remarks in rebuttal or afterwards outside the presence of the jury, it could have ended up with a curative instruction or, at least he could have preserved the objection for appeal.
4. Failure of Attorney Hauslaib to Press for Exculpatory Information.
It is well settled law that under Brady v. Maryland, 373 U.S. 83 (1963) the State must turn over to the defense promptly any exculpatory material it may have or to which it has access. Failure to make every effort to seek out potential exculpatory material is below the standard of competence of a criminal defense attorney.
The testimony at the habeas trial from Attorney Hauslaib was that some time prior to the commencement of trial and long before the actual CT Page 11966 commencement of the trial, he talked to Attorney Collins who following her office's policy of providing to defense counsel an "open file", she made the State's file available to him. He then asked her if there was anything else in response to which she showed him Petitioner's Exhibit No. 35 which is a letter from the State's Attorney in Maryland to an officer of the Elkton, Maryland Police Department which states in regard to Robert Wiseman: "Please be advised that I have carefully reviewed yourreport in the above matter. I am recommending no criminal charges be placed in this case." (Emphasis added). Based upon that, as testified by Hauslaib at the habeas trial (H.Tr. 7/10/02 pages 81-82[6]) Hauslaib asked Collins if there was a police report from Maryland. In response she handed him Petitioner's Exhibit No. 35. He then asked her: "Is that all there is?", to which she replied, "This is what we have." He then said, "And that's what was produced when I asked for a police report." He, therefore inquired about the Maryland police report and was not given a copy of same, Collins denying that she had it. Hauslaib should have, at that time, made an effort to obtain the report from Maryland, and if Collins did not cooperate immediately, he should have filed a motion for disclosure of that particular report claiming it was potentially exculpatory. He did not do so. It wasn't until he met with Assistant State's Attorney Jo Anne Sulik in preparation for the habeas trial, she being the Respondent's attorney, that he was given a copy of the Maryland report. According to the markings on the Maryland report, Petitioner's Exhibit 29, it was faxed on May 17, 1999. Although it doesn't indicate to whom it was faxed, it would be the same date and time at which Petitioner's Exhibit 35, the letter from the State's Attorney to the Elkton police, was faxed. It is a reasonable inference to believe that the report and the letter were faxed at the same time to the State's Attorney's Office in Danielson. That also involves an issue of prosecutorial misconduct which will be discussed hereafter. However, with a court order to the State to produce the report, it could have been obtained immediately by a telephone call to the Elkton police to have the Elkton police fax it to Danielson immediately. Hauslaib's failure to make a full effort, the just proposed effort likely to be successful, to obtain this report was below the standard of competence of criminal defense attorneys in the area. Collins was not called as a witness at the habeas trial.
5. How Was the Report Exculpatory?
The answer is that it had impeachment value. On page 30 of Respondent's brief, Respondent states: "It may have had some impeachment value." The report quoted the victim as telling the Elkton police that her relationship with Wiseman[7] was one of close friendship, they lovedeach other and he would wait for her until she was eighteen years of ageCT Page 11967and out of her parent's control." (Emphasis added). Both the victim and Wiseman in their testimony at the criminal trial indicated that it was almost a platonic relationship, that they were just friends and had done nothing improper. However, the victim told the Elkton police that "Wiseman and her have French kissed approximately twenty times with occasions at her residence. The victim said they spent the night in his truck at Allentown, Pennsylvania with her sleeping on the top bunk and Wiseman in the lower bunk . . . The victim did say they slept on the same bunk one time. On this occasion they slept head to feet, with her head being at the end of the bunk his feet were." The report further states that Wiseman dropped off a money order for $55 to pay for the first counseling session following the discovery of this relationship by MC's mother, Joy C. This and other material in the Maryland report could have been used to impeach the credibility of both the victim and Wiseman in the criminal trial. The Respondent in its post-trial brief on page 32 in describing the three components of a true Brady violation cites Stricklerv. Greene, 527 U.S. 263, 281-82 (1999) "The evidence at issue must be favorable to the accused, either because it is exculpatory or because itis impeaching; that evidence must have been suppressed by the State,either willfully or inadvertently; and prejudice must have ensued."
(Emphasis added). This Court finds that all three components have been met. The information could certainly have been used for impeachment purposes, either the State had the report as seems likely or could have easily obtained the report, and the prejudice in not having the report is that Hauslaib was limited in his ability to cross-examine the victim and Wiseman.
Attorney Kaatz testified at the habeas trial that the report was exculpatory as did Attorney Hauslaib. Kaatz stated that it was below the level of competence of a criminal defense attorney in the area to not have made stronger efforts to obtain the report. This Court agrees with Attorney Kaatz. Hauslaib testified at the habeas trial as to the type of questions he would have asked to impeach the credibility of the victim and Wiseman and it would have helped in his cross-examination of the victim's mother. See H.Tr. of 7/9/02 pp. 62-64. In short his cross-examination of the victim and Wiseman was not complete. His cross-examination of these two witnesses was below the level of competence of criminal defense attorneys in the area.[8]
 6. Hauslaib's Failure to Present Effectively an Alibi Defense and/or Factually Impossible Defense for the Petitioner to have Committed the Crimes Alleged.
(a) The Court finds that the incidents for which Toccaline was charged allegedly occurred on June 29, 1996, August 3, 1996 and September 7, CT Page 11968 1996. This is based upon the dates set forth in the victim's statement to the state police and the dates set forth in the affidavit for the arrest warrant. At the criminal trial, MC, the alleged victim, was somewhat vague in her recollection of the three dates on which these incidents occurred. With prompting from Collins, she described them as being in June of 1996, August of 1996 and September of 1996. However, at the time that Collins attempted to introduce MC's statement to the police, there was a colloquy outside of the presence of the jury with Collins, Hauslaib and the Court. Collins, in response to Hauslaib's objection as to the statement being introduced, stated as follows:
 "Several reasons, your honor. One, for consistency due to her age, just to make sure that everything within the statement that the jury themselves can see that, in fact, was, in fact, placed in the statement.
 Also, we're dealing with dates where it may sound like I leaded — I led the victim as to those dates where those dates are much more clearer in the statement." (Sic) (Emphasis added).
CTT September 14, 1999, page 54. This Court concludes, therefore, that Attorney Collins was vouching for the dates that were in the statement which are the specific dates of June 29, 1996, August 3, 1996, and September 7, 1996.
(b) According to the testimony and the statement and the arrest affidavit, these incidents all occurred while Toccaline and his girlfriend, Bonnie C., the aunt of MC, were living together and had been living together as boyfriend and girlfriend for a considerable period of time at 9 Oak Drive, Ashford, Connecticut, which was under a rental agreement with Mr. and Mrs. Tyler, the owners of the residence. It was on Lake Chaffee in Ashford, Connecticut.
(c) By deed of June 27, 1996 and mortgage deed of June 28, 1996, Petitioner's Exhibits 40 and 41, Toccaline purchased premises known as 28 Armitage Court, Ashford, Connecticut, which was located a few houses away from 9 Oak Drive, Ashford, Connecticut, where he had been renting the premises. He purchased 28 Armitage Court for $75,000 with a mortgage of $56,250. Furthermore, the Court believes Toccaline's testimony that he moved out of the premises at 9 Oak Drive on June 29, 1996, a Saturday, and into 28 Armitage Court. Allison Bingham, the next door neighbor of Toccaline at Armitage Court, testified at the criminal trial that she had seen Toccaline moving in on June 29, 1996, the same date he had allegedly sexually assaulted MC. These were the only witnesses, plus the deeds, CT Page 11969 that Hauslaib presented at the trial to prove the move on June 29, 1996. He was given other names by Toccaline, specifically, Dennis Pisco. Pisco testified at the habeas trial that he had spent all morning and afternoon on a Saturday in June helping Toccaline to move from 9 Oak Drive to Armitage Court. He also testified that he was never called by Hauslaib or talked to Hauslaib. Importantly, he testified that he and Toccaline moved everything out of the 9 Oak Drive property; that there was nothing left. This included Toccaline's waterbed. Todd Spofford testified at the habeas trial that he, in 1995 and 1996, had been a co-worker with Toccaline at Harte Nissan automobile dealership in Hartford. Although he did not help Toccaline move he did visit him with his wife on the Fourth of July weekend of 1996 at which time he was taken to 9 Oak Drive where he looked into the windows and found a total absence of furniture. He then went back to 28 Armitage Court and was present during a fireworks display on the July 4th weekend. Toccaline testified at the habeas trial that he had not given Spofford's name to Hauslaib.
(d) Toccaline also told Hauslaib about Mark Trudad who had been helping him move on June 29, 1996 back and forth all day. Hauslaib never talked to Mark Trudad.
(e) Bonnie C., testified at the habeas trial initially that she and Toccaline moved out of the Oak Drive residence at the same time and on the same date, which was June 29, 1996. She also testified that all furniture had been moved out and that Toccaline's furniture had been moved to the new house at 28 Armitage Court. She also testified that the waterbed was moved out on June 29, 1996. HTT July 25, 2002, page 12.
(f) If Hauslaib had called Pisco, he would have improved the chances that the jury would believe Toccaline and Bonnie C., moved out at the same time, same date, on June 29, 1996 and there was nothing left there including the waterbed which had been moved to 28 Armitage Court. Hauslaib admitted in the habeas trial that he did not subpoena Connecticut Light and Power records, or telephone records, to show that Bonnie C., was living in Enfield as of July 1, 1996.
(g) If the jury had believed that the moving date was June 29, 1996 with the additional evidence that was not presented by Hauslaib, and the moving occurred right into the evening hours, then it would have been impossible for the Petitioner to commit the acts for which he was charged on June 29, 1996.
(h) More importantly, as for the September 7, 1996 incident, by far the most serious allegation, MC had stated that the Petitioner had sexual intercourse with her on his waterbed in the 9 Oak Drive location. It is CT Page 11970 clear from all the evidence that by September 7, 1996, the Petitioner and his waterbed were at 28 Armitage Court in Ashford. Hauslaib did not make a point of this at the trial.
(i) Hauslaib admitted at the habeas trial that he had not filed a motion for a bill of particulars which would have forced the state to put in their information the specific dates on which these incidents allegedly occurred, and that would have pinned down the dates of June 29, 1996, August 3, 1996, and September 7, 1996. Even if the jury did not see the arrest affidavit and did not see MC's statement, by moving for a bill of particulars, the state would have had to put in the specific dates that were in her statement and the affidavit for the warrant.
(j) Hauslaib's failure to present witnesses and otherwise exploit the contradictions in dates, namely, that Toccaline could not have committed the acts on June 29, 1996 and that the waterbed was no longer at 9 Oak Drive but was at 28 Armitage Court in September of 1996 so MC's description of the September 7, 1996 assault at 9 Oak Drive on the waterbed was incorrect were failures that were below the level of competence for criminal defense attorneys in the area.
(k) Bonnie C.'s statement, Petitioner's Exhibit 32, states: "I came home from work about 9:00 pm." She was referring to the incident on September 7, 1996 when MC had been allegedly forced to have intercourse with the Petitioner. MC in her statement, Petitioner's Exhibit 33, indicates on one hand that Bonnie C. was in the house when MC screamed that Petitioner was attacking her on his waterbed. On the other hand, she states that it wasn't until after the incident and her being in the bathroom that her aunt came home. MC's testimony at the trial was that her aunt came home after the incident. The important thing here is that Bonnie C., testified that she had come home from work at about 9:00 pm on September 7, 1996. However, her employment record from Serv-Pro which is Petitioner's Exhibit 6 shows that she did not work on September 7, 1996. If Hauslaib had subpoenaed these records as did habeas counsel for the Petitioner, he could have impeached Bonnie C.'s credibility with that informationn.
7. Motive.
The Petitioner and Bonnie C., by the admission of both at the habeas trial, broke up prior to June 29, 1996 but departed 9 Oak Drive on that date. The break up was initiated by the Petitioner, and from the testimony at the habeas trial, Bonnie C., was very unhappy about it and was angry that the Petitioner was seeing someone else whom he eventually married. If Hauslaib had presented as a witness Todd Spofford, he would CT Page 11971 have given a motive for Toccaline being "framed". In addition to the testimony that Toccaline had broken up with Bonnie C., and that she wanted him back for a considerable period of time after June 29, 1996, at the habeas trial Spofford described an incident at Harte Nissan several months after June 29, 1996 when both he and Toccaline were present. ". . . and Bonnie came in and was yelling up a storm to Lenny. I don't recall the whole conversation, something about a motorcycle. And she was very rude. She was swearing. I was at my desk. My desk was like sitting where this woman is here and Lenny's was up on a podium and she was out in the service department yelling and screaming. Bankruptcy was involved. It was not a good conversation to have in the dealership. She was swearing, and at that point, when that happened, I got up out of my desk and told her, leave now or I will call the police and have you arrested. And her last words were, as she was screaming at Lenny, "I will — I will fix your ass," kind of speech, she used some foul language in there. . . Lenny was sitting here and I was leaning over his shoulder telling her to get out of this dealership now or I'm going to — and she said — "Lenny, I will fix your ass." This animosity is indicative of her bias and anger towards the Petitioner, and if this testimony were presented at the criminal trial, the argument could have been made that Bonnie C., was a jilted lover who was trying to get back at her former lover. Since she was very close to MC, the jury could have reasonably believed that she and MC had developed the scenario for which the Petitioner was eventually charged.
8. Failure to Have Petitioner Testify on Motion to Suppress.
Hauslaib's failure to have the Petitioner testify at the hearing on the motion to suppress. Hauslaib claims that he did not think that Petitioner would make a good witness, but as Attorney Kaatz points out, it was a win-win situation. It is true that when police officers testify as to the voluntariness of the statement they took, courts generally tend to believe them. However, having the Petitioner testify would provide Hauslaib with a dry run as to how he would testify on cross-examination. If he did a good job in the motion to suppress hearing, then he could consider him as a better witness at time of trial. He could also have pointed out the discrepancies that he believed were in his statement. He could also have compared his statement to that of the victim, which had already been introduced, to show that the state troopers could have gotten the language they used in his statement from the victim's statement which was very, very similar Collins would have cross-examined him, and then, when he would later testify at trial, he would be prepared for the cross-examination. Since it was highly likely that the trial court would deny the motion to suppress anyway, there was no downside to the Petitioner testifying at the motion to suppress hearing. As stated by CT Page 11972 Attorney Kaatz, Hauslaib's failure to present him as a witness on the motion to suppress fell below the level of competence for criminal defense attorneys in the area.
 9. Attorney Hauslaib Correctly Made a Motion in Limine to Exclude the Prior Sexual Assault Convictions, and the Trial Judge Granted the Motion Primarily Because They Were More Than Ten Years Old and the Release From Prison Was More Than Ten Years Old.
The trial court stated: "So under the general impeachment by felony they appear to be too remote in time. I'm going to grant the Motion in Limine for that purpose." See CTT September 14, 1999, page 13. Further, on the same page, Judge Sferraza, the trial judge, also stated that he would not allow the details of the felony conviction or what the conviction was for under any circumstances. He would only allow it if it pertains to truthfulness. For instance, a perjury conviction. However, the trial judge cautioned that evidence concerning character and reputation put on by the defendant could give rise to impeachment by the prior felony conviction. Then, assuming in the motion to suppress hearing that Toccaline had presented well as a witness, which he did in the habeas trial, Hauslaib should have presented him as a full witness in defense in the criminal trial, thus knowing that prior convictions for sexual assault would not be allowed. If there was any doubt of that, Hauslaib should have made an offer of proof of Toccaline's testimony to determine whether or not the testimony would give rise to use of the prior convictions for impeachment purposes. Assuming that the trial judge would not allow the use of the prior convictions, and this Court believes the trial court would not have allowed the prior convictions to come in, Toccaline should have been presented as a full witness. He did testify, but only as to the authentication of the deeds to the new property at Armitage Court and to the mortgage deed, etc. The jury normally wants to hear from the defendant, particularly in a case like this where credibility is so much of an issue. Hauslaib could have inquired of Toccaline as to whether or not he did have sexual relations. with the alleged victim. He, of course, would deny it. Further, the most damaging piece of evidence against Toccaline was his alleged confession, and Toccaline could have picked that apart pointing out those areas which were written in by the police officers to which he did not agree. During the habeas trial, Toccaline showed by circling those sentences, or parts of sentences, the portions that he said were not accurate and were put in by the State Police despite his objection, which testimony and circling he did impressively in the habeas trial. Even though the motion to suppress had been denied, Toccaline could have impeached the validity of the statement. If any of the jurors had believed Toccaline, there would have been reasonable doubt as to whether he committed the crimes. Even if CT Page 11973 Collins were allowed on cross-examination to go into the prior convictions, they would merely be described as felony convictions, and since they were not only remote in time but did not go veracity such as prior false statements, or perjury, etc., it is highly likely that the trial court would not have allowed the prior convictions to be presented. At least by making an offer of proof, Hauslaib would have been able to determine whether these convictions would have been permitted into evidence. In view of these circumstances, this Court agrees with Attorney Kaatz that Hauslaib's limiting the testimony of Toccaline to the authentication of the deeds, was a decision that fell below the level of competence of criminal defense attorneys in the area.
10. Failure to Investigate.
Hauslaib's failure to fully investigate the circumstances of the case. This Court has already described Hauslaib's failure to call Dennis Pisco and other witnesses whose names had been given to him by the Petitioner as to the alibi on June 29, 1996, the day of moving from 9 Oak Drive to 28 Armitage Place. Toccaline admitted in the habeas case that he did not give Hauslaib the name of Todd Spofford, who worked with him at Harte Nissan automobile dealership. Spofford could have been crucial to the alibi. It is not sufficient for the defense attorney to rely on thememory, or lack thereof, of the defendant. Hauslaib could have come across Spofford's name by simply asking Toccaline in private why he thought Bonnie C., was doing this to him. He would probably have replied that she was a jilted girlfriend and was angry because of it, and, then, Hauslaib could have asked him "Were there any incidents in which she showed her hatred of you?" This would probably have sparked Toccaline's memory as to the incident at the Harte Nissan dealership to which Spofford testified at the habeas trial, namely that Bonnie C., came into the dealership, got into a real shouting match, was screaming at Toccaline and using profane language and concluded with "Lenny, I'll fix your ass". Then, Hauslaib could have used Spofford to impeach the credibility of Bonnie C. If Hauslaib then asked Toccaline, in private, "Were any of these witnesses who saw you move or saw the incident with Bonnie C., at the auto dealership know where you were on September 7, 1996?" This would have undoubtedly jogged the memory of both Toccaline and his wife, Cathy, that they had attended Spofford's wedding on September 7, 1996. Hauslaib also could have elicited from Toccaline and then Spofford that Spofford was at a July 4th picnic at 28 Armitage Court which would have verified that Toccaline had moved from 9 Oak Drive to 28 Armitage Court shortly before July 4th. As stated above, Hauslaib should have subpoenaed the work records of Bonnie C., to show that she did not come home from work at 9:00 p.m. on September 7th as she claimed, which was the date of the more serious incident. A defense attorney can't justCT Page 11974take the word of his client. He must talk to other people who knew him,including fellow employees such as Spofford, and Toccaline's wife whothen might have remembered the wedding, and pursued on his own aninvestigation to determine if there was an alibi for the September 7,1996 incident. This Court finds that Hauslaib's failure to investigate these incidents and others as described fell below the level of competence for criminal defense attorneys in the area.
 11. Petitioner Claims That Counsel Was Ineffective For Failing to Secure Consult a Child Expert Concerning the Child's Testimony, the Impact of Such Testimony, or How To Best Deal With a Child's Testimony, and Failed to Call an Expert Witness.
It is probably true that a child expert would have been helpful to Attorney Hauslaib because he admitted at the habeas trial that this was his first sexual assault case involving a child. However, we don't know what advice the child expert would have given to Attorney Hauslaib nor do we know what the expert witness would have testified. Here I agree with Attorney Sulik, counsel for the respondent, in citing the following: "The failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense."State v. Talton, 197 Conn. 280, 297 (1985). Also, in Nieves v.Commissioner of Correction, 51 Conn. App. 615, 622-24 (1999) the court held that the Petitioner's failure to present evidence showing what the witnesses who were not called by the Petitioner would have said if called to testify was fatal to his claim.
 12. Failure to Properly Move for a New Trial Based Upon Newly Discovered Evidence.
Attorney Hauslaib testified that he became aware of the wedding evidence the night before the motion for new trial was to be heard, also being the night prior to sentencing. The wedding evidence is the testimony of Todd Spofford that on September 7, 1996 the Petitioner and his wife, Cathy, attended the wedding of Mr. Spofford at a hotel in Windsor Locks and that they were there from the beginning of approximately 4:30 p.m. until after midnight; further evidence is the candle that they received at the wedding, photographs of them at the wedding, and a videotape of them at the wedding and Spofford's testimony that they were there for the entire evening. This would have made it impossible for the Petitioner to have had sexual intercourse with the alleged victim in the early evening of September 7, 1996. Because Attorney Hauslaib did not receive this information about the wedding until the evening before the sentencing hearing scheduled for November CT Page 11975 12, 1999, he was not fully prepared to argue his motion for a new trial on November 12, 1999 just before the sentencing hearing started. Hauslaib made an offer of proof about receiving the Spofford wedding evidence but did not use it on behalf of the motion for new trial. Because of this evidence that would clearly have given the Petitioner an alibi for September 7, 1996, Hauslaib should have moved for a continuance of the motion for new trial and at the same time for the continuance of the sentencing hearing because of this vital additional evidence. He failed to use it during the motion for new trial which was held on November 12, 1999. If the hearing had been continued, he would have been prepared to offer it. The hearing was not continued, and the motion for new trial was denied. This Court has already found that the inability to use this wedding evidence resulted in part from Hauslaib's failure to fully investigate the potential alibis. However, even though he received this information at the eleventh hour, he should have at least made a strong effort to obtain a continuance so that he could present all of this evidence in the motion for a new trial. This Court takes the more expanded view of the definition of "new evidence". The Great Writ of Habeas Corpus is to see that justice is done. If that evidence could have been obtained as a result of diligence on the part of Hauslaib, and he was not diligent on this, this Court does not believe in the strict interpretation that it is not newly discovered evidence if with reasonable diligence it could have been discovered before. Justice demands that we should not be bound by such definitions if in fact new evidence could contribute greatly to a defendant's alibi defense. Justice must be done, and it would be injustice not to have the Court consider this new evidence. In any event, this Court finds that the failure of Hauslaib to develop this evidence earlier and particularly the failure of Hauslaib to fully present this evidence as part of his motion for a new trial is conduct, or lack of conduct, that falls below the level of competence of criminal defense attorneys in the area.
 13. This Court Found the Petitioner to be a Credible Witness As Was Mr. Spofford, Mr. Pisco, the Tylers (landlords) and, of Course, Attorney Kaatz. Hauslaib Was Candid, but Did Not Have a Clear Memory of the Events of 1999.
On the other hand, the Court did not find Bonnie C., to be a credible witness. Her admission to forging a check, her false testimony as to arriving home from work at 9:00 p.m. on September 7th when the record showed that she did not and her subsequent recanting of her testimony which will hereinafter be described as well as her statements in the incidents at Harte Nissan all make her less than credible. The Court finds the testimony of Joy C., the mother of the alleged victim, to be less than credible. She too recanted on the dates. CT Page 11976
14. Contradiction on Dates.
During the habeas trial when it became apparent that the Petitioner had a legitimate alibi for June 29, 1996 and September 7, 1996, the Respondent presented Bonnie C., and Joy C., to testify that they were mistaken and that in fact these incidents had all occurred on the same dates in 1995. This was an incredible revelation. Further, the records submitted by Bonnie C.'s employer showed that on September 7, 1995, she did not work into the evening hours and would have been home long before 9:00 p.m. These incorrect dates which were given to MC by them, is close to perjury and taints the entire criminal trial.[9]
 15. For All of the Above Reasons This Court Finds that Attorney Hauslaib's Conduct as Defense Attorney for the Petitioner Was Below the Level of Competence for Criminal Defense Attorneys in the Area.
This Court is familiar with Attorney Hauslaib and his trial ability. Attorney Hauslaib appeared before this Court in at least one jury trial in the Judicial District of Windham, and although his client was convicted, he conducted himself properly. I find him to be generally a competent attorney, but something must have slipped in this particular trial because this is not the Attorney Hauslaib that I had known. His conduct was ineffective assistance of counsel to the Petitioner at the criminal trial. Accordingly, the Petitioner has sustained his burden of proof as to the first prong of Strickland v. Washington supra.
B. Did the Petitioner Sustain His Burden of Proving the Second or Prejudice Prong of Strickland, supra.
 Strickland, supra, states in pertinent part: ". . . The defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. 687. Stated elsewhere in Strickland, supra, the prejudice prong is that if it were not for counsel's errors, there is a reasonable probability that the result of the trial would have been different. In Bunkley v. Commissionerof Correction, 222 Conn. 444, 454 (1992) the Connecticut Supreme Court, citing Strickland, also stated: "We conclude that, in order for the petitioner to establish prejudice. . ., he must establish that, as a result of that performance (deficient performance of his attorney), there remains a probability sufficient to undermine confidence in the verdict. . . . Put another way, he must establish that, because of the failure of his . . . counsel. . ., there is a reasonable probability that he remains burdened by an unreliable determination of his guilt." CT Page 11977 This Court believes that the Petitioner has sustained his burden of proof on the second prong of Strickland, supra.
As stated above, Hauslaib failed to file a motion for a bill of particulars. As a result, there was a failure to pin down the dates on everyone's part, the State's Attorney, the defense attorney and the witnesses as well as the State Police who took the statements from the alleged victim. As stated in Strickland, supra, the Petitioner must show "that counsel's errors were so serious as to deprive the defendant of afair trial, a trial whose result is reliable." (Emphasis added).
Certainly the false testimony of Bonnie C., Joy C., the alleged victim and the alleged victim's statement as prepared by the State Police, deprived the Petitioner of a fair trial and seriously undermined the verdict. Petitioner remains burdened by an unreliable determination of his guilt. False testimony strikes at the very heart of prejudice against the defendant, and this alone should warrant a new trial.
Further, the credibility of the witnesses was crucial to the determination of guilt of the defendant/Petitioner. If it were not for the errors of Attorney Hauslaib, as described above, the credibility of the alleged victim would have been seriously undermined by cross-examination. The same is true of Wiseman, another State's witness. Without repeating in detail the various errors as set forth above of trial counsel, suffice it to say that the credibility of Bonnie C. would have been destroyed and her motive would have been seriously questioned, the alibi for June 29, 1996 and September 7, 1996 would likely have resulted in an acquittal because it would have shown the impossibility of the incidents having taken place as alleged. If counsel had objected to the testimony of Grunden and had pressed a motion for sequestration, Grunden's credibility would have been much less. These errors by trial counsel produced an unreliable determination of the Petitioner's guilt, they undermined confidence in the outcome of the trial, and but for these errors, there is a reasonable probability that the result would have been an acquittal. At the very least, without these errors, the result would have been a conclusion of reasonable doubt that would have resulted in an acquittal. Many of these errors standing alone would have been sufficient to question the outcome of the trial and undermine the determination of guilt. However, combining all of these errors makes this Court find that there was clearly prejudice to the Petitioner as a result of these errors combined. Without this combination of errors, there is a reasonable probability that the result of the trial would have been different.
This Court has tried hundreds of habeas petitions and has only granted a new trial once in the case of Angelo Joyner v. Warden[10], which CT Page 11978 decision was upheld by the Appellate Court. Clearly, this Court does not take a decision granting a new trial lightly. The motivation and dishonesty of Attorney Dixon in the Joyner case is not present here. The Court believes that Attorney Hauslaib is an honest and dedicated lawyer who was remiss in this trial. However, the errors in the Petitioner's criminal trial are more numerous than those errors committed by trial counsel in Joyner v. Warden. The errors of trial counsel in the case at bar cry out for a new trial. For these reasons alone, the Court will grant the habeas petition.
 * * * * C. Ineffective Assistance of Appellate Counsel.
The main issue here is prosecutorial misconduct. In State v.Toccaline, 258 Conn. 542 (2001) which is Petitioner's Exhibit 9 in the habeas trial, the Petitioner's Appellate counsel did not raise supervisory authority as an Appellate issue. In the leading case of Statev. Pouncey, 241 Conn. 802, 810 (1997) the issue in that case was whether the Appellate Court should have invoked its supervisory authority to grant the defendant a new trial in light of the allegedly inflammatory remarks made by the Assistant State's Attorney. Certainly, to convince the State Supreme Court to exercise its supervisory authority, the Appellant, through his attorney should have raised the issue and requested that the Supreme Court exercise its supervisory authority. As stated inPouncey, supra: "Thus, even when prosecutorial misconduct is not so egregious as to implicate the defendant's right to a fair trial, an Appellate Court may invoke its supervisory authority to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper (emphasis added). . . . Such a sanction generally is appropriate, however, only when the `[prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal.'" Id. 812. In Pouncey, supra, the court affirmed the Appellate Court's decision not to exercise its supervisory authority because improper remarks were made only once. In Pouncey, the court further found: "Furthermore, the defendant does not claim either that the Assistant State's Attorney in this case previously has used racially charged rhetoric in her arguments to other juries. . . ." That is not the situation in the case at bar. Assistant State's Attorney Collins asked improper questions of Grunden to elicit from him his opinion that MC was telling the truth. This was improper, and State's Attorney Collins either knew it was improper or "ought to have known it was improper". (Emphasis added). See Pouncey, supra at page 811 stating in pertinent part: "When the prosecutor deliberately engages in conduct that he or she knows, or CT Page 11979ought to know, is improper." (Emphasis added). Attorney Collins either knew or ought to have known that it was improper. She propounded this improper question, actually two questions, to elicit two similar answers (See pages 5-6 of this Memorandum). She then compounded the improper questions by citing the answers in both her closing remarks to the jury and in her rebuttal remarks to the jury. This amounted to three instances of prosecutorial misconduct. Further, unlike Pouncey, supra, this particular prosecutor, Attorney Collins, had previously engaged in prosecutorial misconduct. This Court will take judicial notice of CR 11-99-106088, State of Connecticut v. Thomas White, Judicial District of Tolland at Rockville, January 10, 2000, a Memorandum of Decision by Kaplan, J, J. in which he granted a motion to disqualify the Office of the State's Attorney for the Windham Judicial District, including Attorney Collins. Appellate counsel could have found this decision in time for the appeal because it was dated January 10, 2000 which was just a few months after the sentencing in the case at bar. Judge Kaplan found possible ethical violations by Attorney Collins, including a conflict of interest, and disqualified her from the criminal case. There was another instance of possible prosecutorial misconduct which was the withholding of the Maryland Police report which was Brady material. However, that withholding of material did not come to light until the habeas trial which was long after the appeal. State v. Payne, 260 Conn. 446 (2002) which admittedly could not have been known to the Appellate Counsel in the case at bar, nevertheless, was a case in which the Supreme Court did reverse a conviction for prosecutorial misconduct exercising its supervisory authority. In the headnotes, it is stated, inter-alia that "the prosecutor having made statements in his closing argument that were improper, that he knew or should have known were improper, and that reflected a large pattern of deliberate misconduct on his part that significantly prejudiced the defendant here as well as others and that was not likely remedied by corrective instructions from the trial court, a new trial was warranted. . . ."
This Court finds that Appellate counsel should have raised as an issue on appeal in the instant case the Supreme Court exercising its supervisory authority to reverse the conviction based upon prosecutorial misconduct based upon the information that was available to Appellate counsel. Failure to do so is below the level of competence of defense Appellate attorneys in the State of Connecticut. As for the prejudice prong of Strickland, it is reasonably probable that the outcome of the appeal would have been different; i.e. that based upon the decision inState v. Payne, supra, its is reasonably probable that the Supreme Court would have reversed Toccaline's conviction. For this reason alone, this habeas petition should be granted. CT Page 11980
D. Claim of Factual Innocence
In order to find factual innocence the Court must find it by clear and convincing evidence. This Court believes, as stated above, that but for counsel's errors, it is reasonably probable that there would have been a verdict of acquittal. However, with the existence of the alleged confession, Petitioner's written statement to the State Police, this Court cannot find by clear and convincing evidence that the Petitioner is factually innocent.
 CONCLUSION
The Petitioner has met his burden of proving ineffective assistance of counsel and that if it were not for same, the result of the proceedings would probably have been different in accordance with the standard set byStrickland v. Washington, supra. Accordingly, the petition for habeas corpus is granted, and a new trial of the Petitioner is ordered.
The Petitioner is ordered conditionally released from confinement. He shall be absolutely discharged unless within thirty days from the date of this Memorandum of Decision, the State's Attorney for the Judicial District of Windham files with the Clerk's Office a written notice of intention to proceed with the retrial of the Petitioner. A copy of any such notice shall be provided to the Petitioner, to his counsel of record in this habeas proceeding, and to the Habeas Court.
The undersigned, sitting as the Habeas Court, shall retain jurisdiction to make, upon proper motion, a bail determination for the release of the Petitioner while an appeal is pending and/or while the awaiting of a new trial if the State's Attorney chooses to proceed with a new trial.
Further, this Court hereby schedules a hearing on the issue of whether the Petitioner should be released on bond on September 24, 2002 at 10:00 a.m. m Courtroom 4B, 101 Lafayette Street, Hartford, Connecticut.[11]